UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| ROSEMARIE MEZA, ) | |
| ) | |
|     Plaintiff, ) | Case No. CV 15-05863 AJW |
| ) | |
|   v. ) | MEMORANDUM OF DECISION |
| ) | |
| CAROLYN W. COLVIN, ) | |
| Acting Commissioner of the ) | |
| Social Security Administration, ) | |
| ) | |
|     Defendant. ) | |

Plaintiff filed this action seeking reversal of the decision of defendant, the Commissioner of the Social Security Administration (the "Commissioner"), denying plaintiff's application for disability insurance benefits. The parties have filed a Joint Stipulation ("JS") setting forth their contentions with respect to each disputed issue.

**Administrative Proceedings**

The parties are familiar with the procedural facts, which are summarized in the Joint Stipulation. [See JS 2-3]. Plaintiff filed an application for benefits on May 18, 2012 alleging disability beginning March 28, 2012. [AR 139]. Following a hearing, the administrative law judge ("ALJ") denied benefits in a January 16, 2014 written decision that constitutes the Commissioner's final decision in this matter. [JS 2; Administrative Record ("AR") AR 1-6, 13-21]. The ALJ determined that plaintiff suffered from the following severe impairments: congestive heart failure; insulin-dependent diabetes mellitus; status post

abdominal surgeries with history of intermittent nausea, vomiting and diarrhea; right wrist pain, secondary to osteopenia; morbid obesity; chronic anemia, COPD and asthma, controlled by medication; and lower extremity lymphedema. [AR 19]. The ALJ also found that plaintiff had non-severe impairments consisting of diabetic retinopathy, hypertension, depression and anxiety. [AR 19-20]. The ALJ determined that plaintiff retained the residual functional capacity ("RFC") to perform sedentary work with the following additional limitations:

> [Plaintiff] is restricted to occasionally climbing ramps, never climbing stairs, never climbing ladders, ropes or scaffolds, occasionally balancing, stooping, kneeling, crouching and crawling. [Plaintiff] has no manipulative limitations. She must avoid concentrated exposure to extreme heat, cold and humidity, avoid all exposure to fumes, dusts, gases, poor ventilation and pulmonary irritants, and avoid even moderate exposure to hazards, such as heights and machinery.

[AR 22].

The ALJ concluded that plaintiff was not disabled from March 28, 2012 through the date of her decision because plaintiff's RFC did not preclude performance of her past relevant work as an accounts payable clerk, legal secretary, or insurance clerk. [JS 3].

**Standard of Review**

The Commissioner's denial of benefits should be disturbed only if it is not supported by substantial evidence or is based on legal error. Brown-Hunter v. Colvin, 806 F.3d 487, 492 (9th Cir. 2015); Thomas v. Barnhart, 278 F.3d 947, 954 (9th Cir. 2002). "Substantial evidence" means "more than a mere scintilla, but less than a preponderance." Bayliss v. Barnhart, 427 F.3d 1211, 1214 n.1 (9th Cir. 2005). "It is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Burch v. Barnhart, 400 F.3d 676, 679 (9th Cir. 2005) (internal quotation marks omitted). The court is required to review the record as a whole and to consider evidence detracting from the decision as well as evidence supporting the decision. Robbins v. Social Sec. Admin, 466 F.3d 880, 882 (9th Cir. 2006); Verduzco v. Apfel, 188 F.3d 1087, 1089 (9th Cir. 1999). "Where the evidence is susceptible to more than one rational interpretation, one of which supports the ALJ's decision, the ALJ's conclusion must be upheld. Thomas v. Barnhart, 278 F.3d 947, 954 (9th Cir. 2002) (citing Morgan v. Comm'r of Soc. Sec. Admin., 169 F.3d 595,

599 (9th Cir. 1999)).

## Discussion

**Treating source opinion**

Plaintiff contends that the ALJ erroneously rejected the opinion of plaintiff's treating physician and family medicine practitioner, Dr. Elisabeth Brown. [See JS 4-6].

In general, "[t]he opinions of treating doctors should be given more weight than the opinions of doctors who do not treat the claimant." Orn v. Astrue, 495 F.3d 625, 632 (9th Cir. 2007) (citing Reddick v. Chater, 157 F.3d 715, 725 (9th Cir. 1998)); see Tonapetyan v. Halter, 242 F.3d 1144, 1148 (9th Cir. 2001). A treating physician's opinion is entitled to greater weight than those of examining or non-examining physicians because "treating physicians are employed to cure and thus have a greater opportunity to know and observe the patient as an individual . . . ." Edlund v. Massanari, 253 F.3d 1152, 1157 (9th Cir. 2001) (quoting Smolen v. Chater, 80 F.3d 1273, 1285 (9th Cir. 1996) and citing Social Security Ruling ("SSR") 96-2p, 1996 WL 374188); see generally 20 C.F.R. §§ 404.1502, 404.1527(c)(2), 416.902, 416.927(c)(2). When a treating physician's medical opinion as to the nature and severity of an individual's impairment is well-supported and not inconsistent with other substantial evidence in the record, that opinion must be given controlling weight. Edlund, 253 F.3d at 1157; see Orn, 495 F.3d at 631; SSR 96-2p, 1996 WL 374188 at 1-2.

Even when not entitled to controlling weight, "treating source medical opinions are still entitled to deference and must be weighed" in light of (1) the length of the treatment relationship; (2) the frequency of examination; (3) the nature and extent of the treatment relationship; (4) the supportability of the diagnosis; (5) consistency with other evidence in the record; and (6) the area of specialization. Edlund, 253 F.3d at 1157 & n.6 (quoting SSR 96-2p and citing 20 C.F.R. § 404.1527).

If a treating source opinion is uncontroverted, the ALJ must provide clear and convincing reasons, supported by substantial evidence in the record, for rejecting it. If contradicted by that of another doctor, a treating or examining source opinion may be rejected for specific and legitimate reasons that are based on substantial evidence in the record. Batson v. Comm'r of Soc. Sec. Admin., 359 F.3d 1190, 1195 (9th Cir. 2004); Tonapetyan, 242 F.3d at 1148-1149; Lester v. Chater, 81 F.3d 821, 830-831 (9th Cir. 1995).

Dr. Brown stated that she has treated plaintiff at Presbyterian Intercommunity Hospital, Bright

1  Health physicians group ("Bright Health") for nine years. [AR 893]. When plaintiff's insurance changed
2  in late 2012, plaintiff began seeing the physicians at AltaMed for her primary care. [AR 68; see AR 1000-
3  1096]. Between Dr. Brown, her colleagues, and the treating physicians at AltaMed, there is an expansive
4  medical record showing regular doctor visits throughout 2011, 2012 and 2013, including routine physical
5  examinations, lab testing, symptom review, medication management, referrals to outside treatment
6  providers, flu vaccines, mammograms, post-surgery follow-up, and education and counseling about
7  healthful lifestyle choices. [See AR 222-572, 631-753, 754-802, 803-855, 893-904, 905-995, 1096-1099].
8  The majority of these records come from Bright Health, where Dr. Brown was plaintiff's primary care
9  provider.

10  In a letter dated September 9, 2012, Dr. Brown stated that plaintiff is "very fragile" from a cardiac
11  standpoint since she had severe congestive heart failure, with an ejection fraction of 27%[1] and global
12  hypokinesis (slow or diminished heart movement). Dr. Brown said that a stent had been placed in plaintiff's
13  left anterior descending artery in March 2011, but that surgeons were "unable to improve the flow through
14  the other occluded vessels." [AR 893], Dr. Brown added that plaintiff has COPD with asthmatic
15  component, which put her at a high risk for respiratory infections, and insulin-dependant diabetes with
16  complications, including vision impairment and neuropathy. [AR 893].

17  Dr. Brown also completed a medical source questionnaire dated July 25, 2013 [AR 897-904]. She
18  wrote that she had been seeing plaintiff every three months or as needed for ten years. She listed plaintiff's
19  diagnoses as congestive heart failure, asthma, coronary artery disease, and type II diabetes mellitus with
20  renal, ophthalmic, and neurological complications. Dr. Brown cited as supporting clinical findings a 2011
21  echocardiogram showing ejection fraction of 50% (without, however, explaining the significance of the

---

[1]  An individual's ejection fraction is "[a] measurement of how much blood the left ventricle pumps out with each contraction." A normal ejection fraction "may be between 50 and 70," while an ejection fraction under 40 may be evidence of heart failure or cardiomyopathy," and between 41 and 49 "may be considered 'borderline' but does not always indicate that a person is developing heart failure. It may indicate damage, perhaps from a previous heart attack." American Heart Ass'n website, Ejection Fraction Heart Failure Measurement," *available at* http://www.heart.org/HEARTORG/Conditions/HeartFailure/SymptomsDiagnosisofHeartFailure/Ejection-Fraction-Heart-Failure-Measurement_UCM_306339_Article.jsp#.WK4b6qHTncs (last visited Feb. 22, 2017).

4

increase from 27% referenced in her September 2012 letter). Dr. Brown also noted plaintiff's history of a stent placement in March 201, and clinical evidence of bilateral proliferative retinopathy secondary to diabetes. [AR 898]. Dr. Brown commented that plaintiff had severe persistent asthma, with as many as six asthma attacks per year that required physician intervention, and that plaintiff could not tolerate dust, smoke, or fumes. [AR 897]. She opined that plaintiff's prognosis was "poor/guarded." [AR 898].

Asked to estimate plaintiff's RFC in a normal, competitive, eight-hour-a-day, five-day-a-week work environment, Dr. Brown indicated that plaintiff was limited to sitting, standing, and walking up to two hours a day, and that she should not sit continuously, and that she could carry less than ten pounds "rarely." [AR 902-903]. She said plaintiff would need 15-minute breaks to use the restroom[2] and would need to elevate her legs 75% of the time in a sedentary job. [AR 902]. Dr. Brown opined that plaintiff could lift five pounds occasionally and could not do any frequent lifting. [AR 899]. Dr. Brown said that plaintiff was incapable of even low stress jobs because stress could increase blood sugar. [AR 901]. Dr. Brown added that plaintiff would likely miss more than four days of work per month. [AR 904].

Dr. Brown acknowledged that she had not seen plaintiff since December 2012 and that plaintiff's medications were "unknown at this time." [AR 901]. However Dr. Brown had treated plaintiff consistently for nine years until December 2012. [AR 906]. The medical source statement does cite Dr. Brown's long treatment history with plaintiff, and there are hundreds of pages of medical records from Dr. Brown and her colleagues in the administrative record confirming that lengthy treating history. [See AR 222-572, 631-753, 754-802, 803-855, 893-904, 905-995, 1096-1099].

Referring both to Dr. Brown's September 2012 letter and to her July 2013 questionnaire, the ALJ said that she "accord[ed] little weight to this opinion because it is inconsistent with near-contemporaneous treatment notes and check-box opinions are not credible when not supported by a narrative, objective medical evidence, or treatment records." [AR 27 (citing AR 1023)]. The ALJ's stated reasons for rejecting Dr. Brown's opinion as a whole as expressed in her letter and questionnaire are not specific, legitimate and supported by substantial evidence in the record.

---

[2] Dr. Brown's opinion is ambiguous with respect to the number and frequency of bathroom breaks plaintiff would need because she indicates that plaintiff would need nine breaks an hour, each lasting 15 minutes–obviously an impossibility. [See AR 902].

5

1 Dr. Brown identified clinical or objective findings in support of her opinion. Regarding plaintiff's
2 cardiac impairment, she cited plaintiff's diagnosis of severe congestive heart failure, her echocardiogram
3 showing an abnormal ejection fraction, and her history of stent placement that was successful in only one
4 vessel, leaving other occluded vessels. In addition, plaintiff's contemporaneous treatment records contain
5 numerous objective and clinical findings that support Dr. Brown's opinion. Indeed, the ALJ expressly relied
6 on treating source records from Dr. Brown and others in finding that plaintiff had a severe impairment of
7 "chronic congestive heart failure, with right heart failure, secondary to left heart failure, as well as an
8 abnormal nuclear stress test, with prior anterior wall myocardial infarction that was silent." [AR 24; see AR
9 19]. The ALJ noted medical evidence of "an ejection fraction of at least 40%, indicating left ventricular
10 dysfunction," "multiple cardiac risk factors, including diabetes and an abnormal EKG suggesting anterior
11 wall involvement," "angiogram in March 2011 that revealed two-vessel coronary artery disease, with an
12 intermediate lesion in the right coronary artery, as well as a significant lesion in the left anterior descending
13 artery," "myocardial perfusion scanning reveal[ing] a left ventricular ejection fraction of 27%, global
14 hypokinesis, and a large mycoardial infarct," and plaintiff's history of two cardiac stent placements. [AR
15 19, 24; see AR 652, 777, 782, 785-786].

16 Similarly, Dr. Brown's opinion that plaintiff would need to take breaks to "go to [the] restroom"
17 frequently throughout the workday due to gastrointestinal ("GI") problems is supported by contemporaneous
18 treatment notes indicating that plaintiff complained of GI symptoms, exhibited moderately severe
19 gastroesophageal reflux, underwent abdominal surgery, and had diagnoses of GI conditions and chronic
20 diarrhea, which at times was uncontrolled---evidence that the ALJ relied upon to find that plaintiff had a
21 severe impairment of "status post abdominal surgeries with history of intermittent nausea, vomiting and
22 diarrhea." [AR 25; see AR 562, 564, 689, 823, 854, 1023, 1035, 1038].

23 Dr. Brown included a discussion of plaintiff's diabetes in her letter, explaining that it was under
24 control but contained the attendant risks of retinopathy and neuropathy. [AR 893]. That is consistent with
25 treating source reports noting laboratory test results showing elevated hemoglobin A1c and glucose levels
26 with retinopathy and neuropathy. [AR 24, 213, 574, 646-649, 1100-1124].

27 Dr. Brown's opinion that plaintiff's COPD and asthma cause "intermittent respiratory difficulty,"
28 and put her at high risk for respiratory infection [AR 893] is also supported by plaintiff's medical records.

6

[See AR 635, 645, 647-648, 729-731, 906, 1038]. The ALJ acknowledged that the medical evidence showed acute exacerbation and persistent moderate asthma notwithstanding plaintiff's use of medications. [AR 25, 635].

The ALJ also rejected as unsupported by the medical evidence and treatment notes Dr. Brown's opinion that plaintiff's legs should be elevated "above [her] heart,] "75%" of the time. [AR 28, 902]. The ALJ found that the objective medical evidence established lower extremity lymphedema as a severe impairment impairment but rejected Dr. Brown's opinion as to the severity of that impairment because an AltaMed treating physician. Dr. Vu, opined "that [plaintiff] had no edema with normal monofilament exam and normal dorsalis pedis pulses, despite [plaintiff's] diagnosis of lymphedema." [AR (citing AR 798)].

Dr. Vu found no edema during an October 2012 office visit, and there were other instances in which treating sources found no edema present. [See, e.g., AR 1043, 1075]. Nonetheless, plaintiff still had a diagnosis of chronic lymphedema, and her treating sources from both Bright Health and AltaMed reported dozens of instances when noticeable swelling was present in plaintiff's extremities during her routine medical examinations. [See AR 323-326, 357, 387, 390, 393, 429, 460, 466, 489, 648, 658, 722, 725,730, 760, 799, 801, 913, 938, 947, 1023, 1037, 1029, 1037, 1060, 1065, 1079]. Medical reports on January 26, 2011 document "severe" edema. [AR 489]. On February 2, 2011, it was noted that "[t]here is lower extremity edema, 3+ noted up to her thighs." [AR 658]. On February 22, 2011, plaintiff's lower extremity exam was "[m]ost notable for leg swelling in her wounds in her upper thigh area secondary to edema." [AR 799]. On March 10, 2011, plaintiff's lower extremities "have 2-3+ pitting edema up to her thighs with evidence of venous ulcers seen in the proximal thigh." [AR 725]. Treating sources documented "mild" edema on November 2, 2011 and "moderate" edema on March 21, 2012. [AR 361, 390]. In July 2012, plaintiff's edema was severe enough to require hospitalization to elevate and drain plaintiff's legs. [AR 913]. Even after hospitalization, plaintiff continued to struggle with leg swelling. Medical reports from February 20, 2013 and May 6, 2013 read "edema is present." [AR 1037, 1065]. Plaintiff's physicians recorded episodes of observable swelling in her legs as recently as August 2013, three months before the hearing in November 2013. [AR 1023-1024]. Accordingly, the ALJ did not articulate specific, legitimate reasons for rejecting Dr. Brown's opinion as to the number and frequency of times a day plaintiff would need to elevate her legs due to edema. See Regennitter v. Comm'r of the Social Sec. Admin., 166 F.3d 1294, 1298 (9th Cir.

1999) ("To say that medical opinions are not supported by sufficient objective findings or are contrary to the preponderant conclusions mandated by the objective findings does not achieve the level of specificity our prior cases have required . . . . The ALJ must do more than offer his own conclusions. He must set forth his own interpretations and explain why they, rather than the doctors', are correct.").

Even when a physician's opinions "are expressed in check-box form," they are "entitled to weight that an otherwise unsupported and unexplained check-box form would not merit" when they are "based on significant experience with [a claimant] and supported by numerous records . . . .. Garrison v. Colvin, 759 F. 3d 995, 1013 (9th Cir. 2014) (footnote omitted). Here, the ALJ failed to recognized that even those parts of Dr. Garrison's opinion that were expressed as a "check-box opinion" were gleaned from years of treating plaintiff for impairments that the ALJ found severe, and at least some aspects of Dr. Brown's treating source opinions were well-supported by the record. See SSR 96-2p, 1996 WL 374188, *3-*4 ("For a medical opinion to be well-supported by medically acceptable clinical and laboratory diagnostic techniques, it is not necessary that the opinion be fully supported by such evidence . . . .").

**Remedy**

A district court may "revers[e] the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing[.]"Treichler v. Comm'r of Soc., Sec. Admin., 775 F.3d 1090, 1099 (9th Cir. 2014) (quotomg 42 U.S.C. § 405(g)). As the Ninth Circuit has explained, however,

> the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation. Our case law precludes a district court from remanding a case for an award of benefits unless certain prerequisites are met. The district court must first determine that the ALJ made a legal error, such as failing to provide legally sufficient reasons for rejecting evidence. If the court finds such an error, it must next review the record as a whole and determine whether it is fully developed, is free from conflicts and ambiguities, and all essential factual issues have been resolved. In conducting this review, the district court must consider whether there are inconsistencies between the claimant's testimony and the medical evidence in the record, or whether the government has pointed to evidence in the record that the ALJ overlooked and explained how that evidence casts into serious doubt the claimant's claim to be disabled. Unless the district court concludes that

>further administrative proceedings would serve no useful purpose, it may not remand with a direction to provide benefits. If the district court does determine that the record has been fully developed, and there are no outstanding issues left to be resolved, the district court must next consider whether the ALJ would be required to find the claimant disabled on remand if the improperly discredited evidence were credited as true. Said otherwise, the district court must consider the testimony or opinion that the ALJ improperly rejected, in the context of the otherwise undisputed record, and determine whether the ALJ would necessarily have to conclude that the claimant were disabled if that testimony or opinion were deemed true. If so, the district court may exercise its discretion to remand the case for an award of benefits. A district court is generally not required to exercise such discretion, however. District courts retain flexibility in determining the appropriate remedy, and a reviewing court is not required to credit claimants' allegations regarding the extent of their impairments as true merely because the ALJ made a legal error in discrediting their testimony. In particular, we may remand on an open record for further proceedings when the record as a whole creates serious doubt as to whether the claimant is, in fact, disabled within the meaning of the Social Security Act.

Dominguez v. Colvin, 808 F.3d 403, 407–408 (9th Cir. 2015) (internal quotation marks, citations, and brackets omitted).

The ALJ committed reversible legal error by failing to provide legally sufficient reasons for rejecting Dr. Brown's treating source findings and conclusions, and that error infects the reliability of the ALJ's findings at steps two, three, and four of the sequential evaluation procedure. There is, however, at least some ambiguity in Dr. Brown's opinion. Furthermore, the ALJ ended the sequential evaluation procedure at step four, without making a finding as to plaintiff's ability, if any, to perform alternative work. Accordingly, the Court exercises its discretion to remand this matter to the Commissioner for further administrative proceedings and issuance of a new decision.

///

///

///

On remand, the Commissioner shall direct the ALJ to conduct a supplemental hearing, to reevaluate Dr. Brown's opinion and the record as a whole, and to issue a new decision containing appropriate findings.[3]

**Conclusion**

For the reasons stated above, the Commissioner's decision is **reversed**, and this case is **remanded** to the Commissioner for further administrative proceedings consistent with this memorandum of decision.

**IT IS SO ORDERED.**

February 27, 2017.

_____
ANDREW J. WISTRICH
United States Magistrate Judge

---

[3] This disposition makes it unnecessary to consider plaintiff's remaining contentions. On remand, the ALJ shall re-perform the five-step sequential evaluation in light of a proper assessment of the medical evidence and the record as a whole.